Filed 7/13/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B346902 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 24PDCF00287) |
| v. | |
| NESTOR DANIEL MIRANDA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rita L. Badhan, Judge. Affirmed.

Jake E. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jason Tran, Eric Swenson and Jonathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

May California, consistent with the United States Constitution, prohibit a "person [from] carr[ying] concealed upon [his or her] person any dirk or dagger"? (See Pen. Code, § 21310.[1]) We conclude it may. Because we further conclude this defendant forfeited his challenge to his sentence, we affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

On April 3, 2024 around 6:00 p.m., Nestor Daniel Miranda used a scooter to break the windows of a vehicle parked at a Monrovia grocery store. Miranda entered the vehicle's driver seat. It was later determined the vehicle owner kept a long knife under that seat for protection.

Miranda fled the scene on foot. Witnesses called the police. As Monrovia Police Officer Zaira Munguia and her partner arrived, Officer Munguia saw Miranda at the corner; he matched the suspect's description and was carrying a scooter. Miranda initially complied with Officer Munguia's commands to drop the scooter and step onto the curb. He then removed a knife from his waistband, dropped it on the ground, and ran. The knife was 14 inches long with an eight-inch blade. Officer Munguia pursued Miranda in her patrol vehicle. Miranda complied with her orders to sit on the curb and was later arrested.

Miranda was charged in an amended information with felony vandalism (§ 594, subd. (a); count 1) and carrying a concealed dirk or dagger (§ 21310; count 2). As to count 1, it was further alleged the vandalism resulted in more than $400 in damages (§ 594, subd. (b)(1)). As to both counts, it was further alleged Miranda had served a prior prison term and had

---

[1]     Undesignated statutory references are to the Penal Code.

previously performed unsatisfactorily on probation. (See Cal. Rules of Court, rule 4.421(b)(3), (5).)

The jury found Miranda guilty on both counts and found true the allegation on count 1 that the amount of damage exceeded $400. The trial court granted the People's request to dismiss the California Rules of Court allegations. Miranda was sentenced to two years in county jail: a low-term sentence of 16 months on count 1 and a consecutive eight-month (one-third the midterm) sentence on count 2.

Miranda timely appealed. (See § 1237, subd. (a); Cal. Rules of Court, rule 8.308(a).)

## DISCUSSION

### I. Section 21310 Is Constitutional

Miranda argues section 21310 violates the Second Amendment to the United States Constitution on its face. A facial challenge may be raised for the first time on appeal. (*People v. Anderson* (2024) 104 Cal.App.5th 577, 583–584.)

Section 21310 reads as follows: "Except as provided in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, any person in this state who carries concealed upon the person any dirk or dagger is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170." (§ 21310; see also § 16470 [defining " 'dirk' or 'dagger' "].) By its terms, section 21310 prohibits carrying a dirk or dagger only in a *concealed manner*; it does not prohibit carrying those weapons openly. (See § 20200.)

The parties agree on the test governing Miranda's Second Amendment challenge, which was recently clarified by the United States Supreme Court in *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1 (*Bruen*). In *Bruen*, the court reaffirmed the "text and history" test it had first articulated

3

in *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*) and rejected an alternative approach other courts had developed in the interim. (*Bruen*, at p. 22; see *id.* at pp. 18–22; see, e.g., *People v. Mitchell* (2012) 209 Cal.App.4th 1364, 1373 (*Mitchell*) [applying intermediate scrutiny to Second Amendment challenge to former § 12020], abrogated by *Bruen*, at pp. 18–22.)

The *Bruen* test proceeds in two parts. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of [arms] regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Bruen, supra*, 597 U.S. at p. 24.)

A facial challenge "is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the [statute] would be valid.' " (*United States v. Rahimi* (2024) 602 U.S. 680, 693 (*Rahimi*); *People v. Hardy* (2026) 120 Cal.App.5th 45, 48, quoting *Rahimi*, at p. 693.) "When evaluating a facial challenge to the constitutional validity of a statute, we consider the text of the statute itself, not its application to the particular circumstances of the individual." (*Mitchell, supra*, 209 Cal.App.4th at p. 1373.) The People "need only demonstrate that [section 21310] is constitutional in some of its applications." (*Rahimi,* at p. 693.)

### A. Section 21310 Is Consistent with Historical Arms Regulations

For purposes of this opinion, we assume, as do the parties, the Second Amendment's plain text presumptively covers carrying a concealed 14-inch knife in public. (See *Bruen, supra*, 597 U.S. at pp. 31–33.)

4

We thus proceed to consider if section 21310's prohibition on carrying concealed dirks and daggers "is consistent with the principles that underpin our regulatory tradition." (*Rahimi, supra,* 602 U.S. at p. 692.) To prevail, the People must show section 21310 is " 'relevantly similar' " to historical arms regulations with regard to both "how and why the regulations burden a law-abiding citizen's right to armed self-defense." (*Bruen, supra,* 597 U.S. at p. 29; see also *United States v. Hemani* (2026) 608 U.S. __, __ [2026 WL 1751710 at p. *5] (*Hemani*).)

Although Miranda questions the relevance of historical evidence from the 19th century, we follow *Heller, Bruen,* and *Rahimi,* which all considered evidence from before the founding of our nation through the end of the 19th century. (*Heller, supra,* 554 U.S. at pp. 593–595, 600–619; *Bruen, supra,* 597 U.S. at pp. 20, 46–70; *Rahimi, supra,* 602 U.S. at pp. 693–698.) The period around the enactment of the Fourteenth Amendment in 1868 is particularly relevant here because it is via the Fourteenth Amendment that the Second Amendment applies to the states. (*Bruen, supra,* 597 U.S. at p. 37; see *id.* at pp. 37–38 [acknowledging "ongoing scholarly debate" over which period controls].)

Historical evidence during those periods shows consistent regulation of concealed arms. In the early to mid-19th century, multiple states banned concealed pistols and other small weapons. (See *Bruen, supra,* 597 U.S. at pp. 52–53; see also *id.* at p. 52, fn. 16 [statutes enacted between 1813 and 1846]; *id.* at p. 59 ["Virginia had criminalized the concealed carry of pistols since 1838"]; *Heller, supra,* 554 U.S. at p. 613 [Tennessee "did not prohibit the banning of concealed weapons"]; *id.* at p. 626; *Rahimi, supra,* 602 U.S. at p. 691.) Those regulations persisted during the second half of the 19th century. (*Bruen, supra,*

597 U.S. at pp. 62–63; see *id.* at p. 63, fn. 27; see also *id.* at p. 68, fn. 30 ["[m]any other state courts during" the late 19th century "continued the antebellum tradition of upholding concealed carry regimes"].)

Miranda largely ignores those laws and seems to suggest we must consider laws pertaining only to knives. We do not agree. The People need not identify a "historical *twin*" of section 21310 in order to demonstrate its constitutionality. (See *Bruen*, *supra*, 597 U.S. at p. 30.) We have already assumed that dirks and daggers are among the arms protected by the Second Amendment, and Miranda has not argued they are relevantly different, particularly when carried in a concealed manner. In any event, "[l]aws banning the concealed carry of . . . dirks and daggers were common in the antebellum period" and after the Civil War. (*Knife Rights, Inc. v. Bonta* (9th Cir. 2026) 165 F.4th 1330, 1341, 1343 (*Knife Rights*).) Violators were typically punished by fines or imprisonment. (*Id.* at pp. 1342, 1343, fn. 10.)

The historical regulation of concealed weapons was generally motivated by public safety concerns, just as was section 21310. It was commonly understood that those carrying concealed weapons were not " 'interested in self-defense, [and] instead must have an improper, aggressive motive.' " (*Baird v. Bonta* (9th Cir. 2026) 163 F.4th 723, 734, rehg. en banc granted, 172 F.4th 1105; see also *id.* at pp. 734–736.) Thus, historical laws were meant to protect the public "from . . . desperadoes with concealed arms." (*Aymette v. State* (1840) 21 Tenn. 154, 159 (*Aymette*); see also *Knife Rights*, *supra*, 165 F.4th at pp. 1343–1344 [concealed knives were banned "because of their common association with and use in criminal activity"].)

6

The same concern motivated California's prohibition on concealed dirks and daggers. For example, in discussing the former section 12020 (later renumbered in part as § 21310), the Court of Appeal remarked: "[t]he Legislature's purpose . . . was to combat the dangers arising from the *concealment* of weapons," including surprise attacks on unsuspecting members of the public. (*Mitchell*, *supra*, 209 Cal.App.4th at p. 1371; see *In re George W.* (1998) 68 Cal.App.4th 1208, 1213 [purpose was to " 'prevent[] surprise knife attacks' "].) Section 21310 was thus meant to address the same threat to public safety that historically motivated states to restrict concealed arms. (See *Rahimi*, *supra*, 602 U.S. at p. 692.)

For all those reasons, section 21310 is robustly supported by our nation's historical tradition of regulating concealed arms and facially consistent with the Second Amendment. By so holding, we do not mean to suggest the Constitution requires every contemporary statute to mirror historical arms regulations as closely as does section 21310. While a "law must comport with the principles underlying the Second Amendment, . . . it need not be a 'dead ringer' or a 'historical twin' " of its precursors to pass muster. (*Rahimi*, *supra*, 602 U.S. at p. 692.)

**B.      Miranda's Counterarguments Are Unpersuasive**

Miranda ignores the historical concealed arms and knife regulations we have identified, and instead relies upon a Supreme Court of Massachusetts case finding a prohibition on carrying a switchblade knife unconstitutional. (*Commonwealth v. Canjura* (2024) 494 Mass. 508, 514; see *id.* at pp. 510, 515, 517–518.) But that case did not discuss concealed weapons, let alone concealed dirks or daggers—weapons traditionally and expressly regulated since the founding. (See *Knife Rights*, *supra*, 165 F.4th at p. 1341.)

Miranda also misunderstands *Heller* when he argues that case "specifically repudiated *Aymette*," an 1840 Tennessee Supreme Court case which had upheld Tennessee's prohibition on certain concealed knives. (See *Aymette*, *supra*, 21 Tenn. at pp. 155, 159.) While *Heller* rejected part of *Aymette*'s holding, it did not disturb the aspect relevant here: "the state constitutional guarantee of the right to 'bear' arms did not prohibit the banning of concealed weapons." (*Heller*, *supra*, 554 U.S. at p. 613.)

## II. Miranda Forfeited His Challenge to His Sentence

Miranda also argues the trial court violated his right to due process by purportedly basing his sentence on his decision to go to trial. (See *In re Lewallen* (1979) 23 Cal.3d 274, 278–279.) Although the People offered to resolve the case if Miranda pled guilty to felony vandalism, Miranda refused to do so. He therefore pled not guilty and proceeded to trial.

According to Miranda, the trial court refused to sentence him to probation in part because he had refused a pretrial plea bargain offer of probation. The People argue the record suggests the trial court merely referred to Miranda's earlier unwillingness to accept probation to explain the court's skepticism of his assurances he would successfully comply with the terms of probation. (See *People v. Szeto* (1981) 29 Cal.3d 20, 35 [the trial court must say something "reasonably giving rise to the inference that [it] was penalizing defendant for exercising his right to jury trial"].) The record reflects the trial court provided many other reasons (beyond the prior plea discussion) the court refused to sentence Miranda to probation after trial.

But we need not parse the record in detail because Miranda forfeited the argument by failing to object. A defendant must object at sentencing to preserve a challenge to "the trial court's failure to properly make or articulate its discretionary sentencing

choices." (*People v. Scott* (1994) 9 Cal.4th 331, 353 (*Scott*).) Forfeiture is particularly appropriate here, where the absence of an objection prevented the trial court and the parties from further developing the record on the issue. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 426–427 [the prosecution was "prevented . . . from developing the record" and the trial court was prevented from taking remedial steps]; see also *People v. Williams* (1998) 61 Cal.App.4th 649, 656 (*Williams*) [" 'Routine defects in the court's statement of reasons are easily prevented and corrected if called to the court's attention.' "].)

Miranda argues forfeiture is inapplicable because the sentence "conflicts with [the] exercise of his constitutional right to a jury trial." But the fact a constitutional right is implicated by a claimed error does not necessarily preclude forfeiture. (See *Williams*, *supra*, 61 Cal.App.4th at pp. 655–656 [vindictive retaliation claim was forfeited by failure to object at sentencing]; see also *In re Horton* (1991) 54 Cal.3d 82, 95 ["that a right is of constitutional stature does not mean . . . only the defendant can waive the right"].)

Miranda has not shown his vindictive sentencing claim is the type of constitutional claim that can be preserved without an objection. (Cf. *People v. French* (2008) 43 Cal.4th 36, 46 [right to a jury trial]; *People v. Saunders* (1993) 5 Cal.4th 580, 592 [double jeopardy]; *People v. Vera* (1997) 15 Cal.4th 269, 276–277 [discussing "certain fundamental . . . rights"], abrogated on other grounds in *French*, at p. 47, fn. 3.) On the contrary, claims of vindictive sentencing—like Miranda's here—are forfeited by a failure to object. (See *Williams*, *supra*, 61 Cal.App.4th at pp. 655–656; see also *Scott*, *supra*, 9 Cal.4th at p. 356 ["complaints about the manner in which the trial court exercises its sentencing

discretion and articulates its supporting reasons cannot be raised for the first time on appeal"].)

## DISPOSITION

The judgment is affirmed.


RICHARDSON, J.


WE CONCUR:


CHAVEZ, Acting P. J.


GOORVITCH, J.